**John H. BAKER, et al., Petitioners,**

v.

**FEDERAL AVIATION ADMINISTRA-TION, and James B. Busey, Administrator, Respondents.**

No. 89–2524.

United States Court of Appeals, Seventh Circuit.

Argued May 7, 1990.

Decided Oct. 31, 1990.

Alan M. Serwer, Raymond C. Fay, Bell, Boyd & Lloyd, Chicago, Ill., for petitioners.

Michael A. Moulis, John H. Cassady, Federal Aviation Admin., Washington, D.C., for respondents.

John S. Yodice, Donald L. Hardison, Gary Green, Jonathan A. Cohen, Washington, D.C., amicus curiae Aircraft Owners and Pilots Ass'n.

Before BAUER, Chief Judge, CUDAHY, Circuit Judge, and WILL, Senior District Judge.*

---

* The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, sitting by designation.

CUDAHY, Circuit Judge.

In 1988, this court decided *Aman v. Federal Aviation Administration*, 856 F.2d 946 (7th Cir.1988) (*Aman I*), in which current and former airline captains sought review under 49 U.S.C.App. § 1486(a) of a Federal Aviation Administration (FAA) order denying a petition for exemptions from FAA regulation § 121.383(c) (the "age sixty rule"). The age sixty rule prohibits flights under Part 121 of FAA regulations, including commercial flights of aircraft seating more than thirty passengers, from taking off under the command of pilots age sixty or older. *See* 14 C.F.R. §§ 121.1, 121.383(c). While the FAA is empowered to grant exemptions to this rule if it "finds that such action would be in the public interest," *see* 49 U.S.C.App. § 1421(c) (the public interest standard), no exemptions have ever been granted.

After recounting the age sixty rule's tortured thirty year history and establishing the appropriate "substantial evidence" standard of review, this court in *Aman I* carefully demarcated petitioners' two claims. The first was that pilots, age sixty or older, meeting petitioners' proposed battery of physical and psychological tests (the protocol), were no more likely to cause accidents due to sudden incapacitation or undetected deterioration of piloting skills than other pilots. The FAA rejected this claim, finding that it was not in the public interest to grant exemptions when petitioners' protocol did not surely reduce *all* incremental risks associated with the aging process. Although this court noted that it might well have concluded otherwise as a matter of first impression, it held that substantial evidence supported the FAA's finding.

Petitioners' second claim was that the flying experience gained by allowing pilots age sixty and older to fly offset any increased risk of accident due to sudden incapacitation or skill deterioration, and that

granting limited exemptions effectively produced a net increase or, at least, no net decline in safety. The FAA summarily rejected this claim. Unsatisfied with the agency's cursory treatment, this court vacated the FAA order and remanded the matter to the agency for further proceedings.

On remand, the FAA again refused to grant exemptions, and an order to that effect is presently before us for review. After considering the FAA's new order and both parties' somewhat flawed evidence, we cannot justify a conclusion that, on average, experience sufficiently offsets possible age-related impairment of health or skills to clearly guarantee a net constancy or increase in safety. Accordingly, we affirm.

I.

While substantial evidence must support the FAA's decision, *see Aman I*, 856 F.2d at 951–52, petitioners have the burden of showing that circumstances justify exemptions from the age sixty rule, especially given the FAA's discretionary authority to act in this area. *Starr v. FAA*, 589 F.2d 307, 311 (7th Cir.1978). It is a heavy burden here involving obviously daunting problems of public safety. Age discrimination may form a dimension of the issue, but safety is the dominant and controlling consideration. The fact that it is apparently very difficult to demonstrate any clear conclusion with respect to the trade-off between experience and possible age-related impairment makes the task extremely onerous for the bearer of the burden of persuasion.

Petitioners have presented anecdotal evidence of superannuated pilots performing heroic deeds. Consider, for example, Captain David Cronin, who at age 59, on his second to last scheduled flight, heroically landed a Boeing 747 en route from Honolulu, Hawaii to Auckland, New Zealand after a forward cargo door blew open 17 minutes after take off, opening a huge hole in the

side of the plane. After two of the plane's four engines became disabled, Captain Cronin consulted emergency operating procedures which directed him to dive, reduce speed and drop the landing gear. However, 38 years of experience told him that, if that course were followed, the plane would lose too much altitude given its weight and multiple emergency situation. Captain Cronin instead operated many of the controls manually, constantly readjusting his speed and altitude calculations. With the exception of the nine passengers killed when the cargo door blew off, Cronin saved the lives of all passengers and crew aboard, safely landing the disabled plane at a much higher than normal speed. Pet. Ex. 105, 105A, 106, J.A. 278–80. In an appropriate context, we might give considerably more weight to the "anecdotal" evidence of pilots in their late fifties immediately before retirement performing amazing feats of airmanship than presumably would the FAA. As noted at oral argument, were the passengers of Flight 811 asked whether their Captain Cronin should be permitted to continue flying beyond the mandatory retirement age of sixty, few could doubt their answer. Nor are we in a position to say they would be incorrect. In the case before us, however, it is apparently not pilots who have performed aeronautical miracles who have sought exemptions, and we need not consider the arguable entitlement of such "special" pilots to exemptions from the age sixty rule.

While petitioners have thus made some suggestive anecdotal showings and presented impressive expert opinion evidence, they have been unable to develop a persuasive statistical record comparing average risks for pilots in various relevant age categories. Petitioners, relying on figures from the National Transportation Safety Board, presented evidence that pilots age sixty and older had a lower accident rate per 1,000 pilots than pilots in other age groups. Pet. Ex. 71, 72, J.A. 215–16. This evidence, however, failed to account for exposure to risk in terms of hours of flight time. Thus, a pilot who had flown only a relatively few hours in a year and therefore incurred only a reduced risk of accident would carry the same weight as a pilot who flew many hundreds of hours with their greater attendant risks. R. 5; R. 103. Such a study is, of course, of questionable value. In addition, no analysis indicated whether the difference in accident experience by age group was statistically significant, a sort of failure specifically criticized in *Aman I.* 856 F.2d at 955. Petitioners also presented evidence that allowing pilots, sixty or older, to fly would increase crew experience on the average, but failed to show with any rigor that there was a significant lack of pilot experience in need of correction.

This is not to say that the FAA's evidence was any more persuasive. The agency relied heavily on an accident experience report by age category referred to as the Flight Time Study. Like petitioners' studies this report has serious flaws.[1] Perhaps the Flight Time Study's greatest failing is that the data for pilots under age sixty include millions of relatively safe air carrier miles flown, miles which because of the age sixty rule were unavailable to pilots over sixty.[2] In calculating the accident rate for pilots sixty and older, the Flight Time Study divides the number of general aviation accidents by general aviation flight time, the only category open to this group. But for pilots under age sixty, the study divides the number of general aviation accidents by general aviation flight time and, in addition, air carrier operations flight time. Because miles flown in air carrier operations are nearly accident free,

---

1. Petitioners point out that the Flight Time Study is not even relevant since that study, as originally presented seven years ago, was based on data from 1976 to 1980 and was never intended to justify the age sixty rule. Numerous comments of record from various experts, even some from the FAA, state that the study should not be relied on as determinative—or even probative—on the question of the continued validity of the age sixty rule. As discussed *infra,* even if the study is relevant, it is only of very limited usefulness.

2. This vast discrepancy in flight exposure for the group studied is one reason the petitioners presented figures on a per-pilot basis without reference to hours flown.

and millions of these extra miles are included in the figures for younger pilots but not for older ones, the accident rate for all pilots under age sixty is significantly understated compared to the rate for older pilots, whose accident rate is overstated. Indeed, looking at the Flight Time Study's chart of accident risk for Class I (airline transport) and Class II (commercial) pilots with greater than 5,000 hours total flight time (Pet.App. 42, Fig. 7), the jump in accidents at age sixty to sixty-nine from age fifty to fifty-nine simply looks too large to be credible.[3]

Even without correcting the Flight Time Study for this disparity in types of current flight hours, the FAA's own study on its face may in some aspects be construed to support the petitioners' claims, the raw data supporting a number of different possible conclusions. Consider, for example, the data showing accident rates as a function of both total and recent flight time for Class III pilots (general aviation and student). These data indicate that pilots age 60–69 (even 70 and over) with more than 1,000 hours total flight time and more than 50 hours recent flight time apparently have two of the lowest accident rates of any age groups of pilots in Class III having various indicated combinations of total and recent flight time. These comparisons apply, of course, even with respect to younger pilots in their thirties and forties, whose safety qualifications are generally unquestioned. Flight Time Study, J.A. 551, Fig. 9, J.A. 575–79, 809. More than 1000 hours total flight time and more than 50 hours recent flight time might be a telling statistic if the FAA could, for example, condition exemptions on total and recent flight time. Safety would be advanced, presumably, if the FAA required pilots to have at least a total of 1,000 flight hours and at least 50 recent flight hours as a condition for exemption.[4]

Another arguable flaw in the Flight Time Study is that all pilots in a ten-year age cohort are combined into a single statistic. Thus, a single point represents pilots aged sixty to sixty-nine. Presumably, more exemptions from the age sixty rule would likely be granted to pilots under, say, sixty-five than pilots over that age. Therefore, the cumulation of accidents caused by pilots in their late sixties with accidents caused by pilots in their early sixties may as a practical matter tend to skew the Study.

The FAA also presented evidence of automobile traffic accidents and fatalities related to age. Res.Addendum B. The connection between automobile drivers and pilots itself seems tenuous given the pilots' training, demonstrated proficiency, medical fitness, etc. Some of the FAA's evidence does not reflect "exposure" and some of it attempts to relate the nonparallel categories of automobile *fatalities* and aircraft *accidents*. Res.Br. at 19, n. 17. Because elderly people seem more likely to *die* as a result of traffic accidents than younger people, the probative value of this latter showing is diminished.

Along with a directive for a more complete consideration of petitioners' second claim on remand, the FAA was also requested to explain how it could rationally grant exemptions to younger pilots who had suffered from alcohol abuse, heart conditions and the like but not grant exemptions to apparently healthy and proficient pilots over age sixty. The agency's justification was that, where particular and identifiable health problems are shown, specific medical tests may be conducted to indicate whether the pilot in question can continue to perform. On the other hand, "[a]ssessing the risks associated with determining which pilots may fly beyond age 60 concerns detrimental conditions which are unknown." Res.Br. at 32. Exactly how this

---

**3.** The chart which shows petitioners' attempt to recalculate these numbers and correct for the safe miles unavailable to pilots over age sixty appears to err in exactly the opposite direction. Pet.Br. at 17. Again, neither party performed statistical analysis which would indicate whether the differences were significant.

**4.** While Class III is not the universe from which air carrier pilots would be selected, it is the category where the ratio of accidents to flight time is subject to the least distortion.

distinction applies as a practical matter is not entirely clear to us, but neither have the petitioners been able to demonstrate its invalidity either theoretically or practically. Nor have petitioners apparently yet been able to present to the FAA a totally reliable test or group of tests which would reveal with certainty any general deterioration of piloting skills associated with advancing age. *See Aman I, supra,* at 954. For present purposes, we will not require more of the FAA with respect to the consistency of restoring stricken younger pilots to duty while barring oldsters whose records are impeccable.

## II.

Admittedly, petitioners in this case face a Catch–22: from one perspective they cannot get exemptions until they show they can fly large passenger aircraft safely, and they cannot show they can fly such planes safely until they get exemptions. Thus, a valid statistical demonstration of comparative safety records by age seems difficult to obtain unless all age groups are engaged in the same kinds of flying. Since the age sixty and over group may not pilot large passenger transport aircraft, statistical comparisons are suspect. Nevertheless, it was the petitioners' burden to present persuasive evidence that granting exemptions would not impair safety. While we have seen no compelling evidence that granting exemptions would increase the risk of accident, neither have we seen strong evidence that the experience of the 60–and–over pi-

lot clearly overbears the danger of deterioration of piloting skills (or of sudden incapacitation) associated with the aging process. Where crucial issues of public safety are at stake, we would look for such a showing. Were the FAA to grant exemptions, it (and we) would no doubt be better able to resolve the question before us, but, absent the requisite compelling evidence, we must defer in these circumstances to the expert agency.[5]

We believe the agency's order is supported by substantial, albeit certainly not compelling, evidence.[6] We reach this conclusion because of the obvious difficulty in attempting to balance on a statistical basis experience against reliable indicators of good health and ability to perform as age advances. Certainly the record abounds with testimonials by experts in both flying and medicine to the experience and judgment of the older aviator and the feasibility of assuring the good health and performance of this kind of pilot through frequent and sophisticated testing. We are certainly not in a position to say that the numerous supporters of the petitioners' case are wrong. And it is obvious that the FAA must continue and must enhance its efforts to accommodate their points of view. At this time, however, we are not prepared to overrule the agency in a matter of such immense sensitivity as this one.[7] The FAA should not take this as a signal that the age sixty rule is sacrosanct and untouchable. Obviously, there is a great body of opinion that the time has come to move on.

---

5. In *Aman I,* we also suggested that there might be administrative or economic reasons for the agency's policy of withholding exemptions from the age sixty rule and invited the FAA to discuss these aspects of the problem if they were relevant. The agency has elected on remand not to address non-safety concerns. We think that administrative and economic factors could hardly be entirely absent. But, since the petitioners have been unable to carry the heavy burden of establishing a case for exemptions from the rule on a safety basis alone, we need not speculate about the economic and administrative aspects.

6. We would reiterate that we are not, as the dissent argues, holding that "*every* airline pilot, on his or her 60th birthday, and regardless of physical condition or experience, becomes a sig-

nificantly greater safety hazard than before...." *Infra* at 326 (emphasis in original). The grant of specific exemptions from the age 60 rule, and not the validity of the rule itself, is at issue here. In any event, line-drawing may inevitably involve some arbitrariness.

7. The principal prescription of the dissent would be merely to remand "for consideration of the adoption of regulations establishing ascertainable and meaningful standards to govern the granting of at least some exemptions to the age 60 rule." *Infra* at 326–327. Of course, as our opinion suggests, we too would look with favor upon this sort of consideration by the FAA. However, this consideration, because of the inevitable delays, would likely be of slight help to these petitioners.

The agency must give serious attention to this opinion.

Accordingly, the order of the Federal Aviation Administration is

AFFIRMED.

WILL, Senior District Judge, dissenting.

This court, in *Aman v. FAA*, 856 F.2d 946 (7th Cir.1988), reviewed the age 60 rule's "tortured history," majority op. at 319, established the appropriate "substantial evidence" standard of review, noted that while the FAA is theoretically empowered to grant exemptions from the rule, none has ever been granted, vacated the FAA's order and remanded the case to the agency for further proceedings and the presentation of further evidence that no airline pilot older than age 59, regardless of physical condition and experience, is qualified to fly a plane seating more than thirty passengers.

When the FAA adopted its age 60 and out rule some thirty-one years ago, in 1959, it justified the rule by stating:

(a) "... that there is a progressive deterioration of certain important physiological and psychological functions with age, that significant medical defects attributable to the degenerative process occur at an increasing rate as age increases, and that sudden incapacity due to such medical defects becomes significantly more frequent in any group reaching age 60"

and

(b) "... that such incapacity, due primarily to heart attacks and strokes, cannot be predicted accurately as to any specific individual on the basis of presently available scientific tests and criteria ... [so that] any attempt to be selective in predicting which individuals are likely to suffer an incapacitating attack would be futile under the circumstances and would not be medically sound...."

24 Fed.Reg. 9767 (Dec. 5, 1959). At the same time, the FAA also found that:

Other factors, even less susceptible to precise measurement ... [also] must be considered. These relate to loss of ability to perform highly skilled tasks rapidly, to resist fatigue, to maintain physical stamina, to perform, effectively in a complex and stressful environment, to apply experience, judgment and reasoning rapidly to new, changing and emergency situations, and to learn new techniques, skills and procedures. The progressive loss of these abilities ... even though they may be significant in themselves prior to age 60 ... assume greater significance at the older ages when coupled with medical defects leading to increased risk of sudden incapacitation.

*Id.*

Since 1959, numerous pilots, approaching or having celebrated their sixtieth birthdays, have petitioned for individual exemptions from the FAA's rigid enforcement of its age 60 and out rule. The agency, however, has never granted an exemption—to anyone, regardless of his or her physical qualifications or experience. Pilots with tens of thousands of hours of flight time and flawless records, and who pass every physical test with flying colors, suddenly are grounded on their sixtieth birthdays, even though the day before they were flying, without restrictions, and were acknowledged to be qualified and, ironically, are still deemed qualified to pilot planes with thirty passengers or less.

I

The FAA actually admits to a policy of uniformly denying all petitions for exemptions from the age 60 rule. It's not that the FAA pretends that no person over the age of 59 could ever safely pilot a Part 121 flight. In fact, the agency concedes that some over–59 captains would do just fine. Denial of Exemption, issued May 26, 1989, p. 31; petitioners' appendix at 31. Then why not grant exemptions to those pilots? Why does the FAA persist in refusing ever to exempt any pilot, no matter how able, from its 60 and out rule? And why does it refuse to issue meaningful standards and criteria for granting at least some exemp-

tions? Because, says the FAA, although many pilots 60 and over would make safe captains, there is simply no way to tell the safe ones from the dangerous ones in advance.

In support of this position, the FAA advances, today, in 1990, the same kinds of justifications it originally offered thirty-one years ago, in 1959. And in 1990, just as in 1959, these justifications are of two types. The first starts from the proposition that "some psychomotor, emotional, intellectual and physical attributes necessary for enhanced flight crew performance deteriorate with age," Exemption Denial at 32, resulting in a "sharp decline in physical and cognitive performance after age 60," *id.* at 30; adds that there is no reliable way of measuring (or even necessarily detecting) the extent of an aging pilot's deterioration; and concludes that it is not scientifically possible to screen out safe 60–year–old pilots from dangerous ones without actually putting them up in the skies and letting them fly.

The FAA's second longstanding justification begins with the observation that at age 60 skills are not only deteriorating but beginning to do so at an increasing and increasingly unpredictable rate; adds that the dangers of their deteriorating to the point of sudden incapacitation (in flight, presumably) is significantly greater at age 60 and beyond than it was before; and finishes, again, with the assertion that there is no reliable way to tell a safe 60–year–old pilot, who won't suddenly collapse in flight, from a dangerous one, who will. "The aging process ... is largely unpredictable, and generally is not measurable.... [T]here are no generally applicable medical tests that can, at this time, adequately determine which individual pilots are subject to incapacitation secondary to either acute cardiovascular or neurological events or to more subtle conditions related to cognitive functioning." Exemption Denial at 32.

## II

Two years ago, in *Aman, supra,* the FAA, advancing both of its customary justifications, defended its original denial of many of the same petitions that are before us again on this appeal. At that time, this court partially upheld the logic of the FAA's customary justifications, finding what the FAA itself has repeatedly held in connection with every request for an exemption since 1959, i.e., "substantial evidence [to] support[ ] ... rejection of the contention that the petitioners' protocol, combined with existing methods of operational testing, would screen out *all* increased risks of incapacitation or undetected skill deterioration among pilots older than sixty." 856 F.2d at 957 (emphasis added).[1] The *Aman* panel, however, ultimately vacated the FAA's denial and remanded for further proceedings, concluding that the FAA had "failed to set forth a sufficient factual or legal basis for its rejection of the petitioners' claim that older pilots' edge in experience offsets any undetected physical losses." *Id.*

It is unclear to me just what the panel in *Aman* meant for the FAA to do on remand. Given the number and variety of tests that are available and commonly used to measure the physical and cognitive powers of pilots—flight simulator tests, vision and depth perception tests, hearing tests, stress tests, blood tests, psychological workups, X-rays, angiograms and EKGs—I find it difficult to believe that there are skills or physical or cognitive abilities which the FAA can identify as necessary for safe flying but for which it either cannot or does not reliably test all pilots, including 60–year–olds and regardless of whether they pilot flights with more than thirty passengers or other flights with fewer passengers. If it *is* true, however, that physical deterioration can't be tested and measured accurately, as the panel in *Aman* found "substantial evidence" to show, then it baffles me how the FAA, on remand, was supposed to reconsider the relationship be-

---

1. I would point out in passing that the FAA does not assert that it screens out *"all"* risks of incapacitation in pilots of any age and that, in fact, from time to time pilots under age 60 have had physical problems in flight.

tween physical skills and abilities, on the one hand, and experience on the other. For whether, if as a pilot grows older, experience lends an edge which offsets waning skills and abilities, necessarily depends on at least two things: (1) how much experience the pilot has and (2) how severely physical skills and abilities have "deteriorated." And if one of those things can't be reliably measured for risk, or even spotted—"[A] substantial body of medical opinion continues 'to doubt the feasibility'" of measuring the "incremental risk associated with ... *undetected* deterioration of skills among pilots over sixty," *Aman*, 856 F.2d at 954 (emphasis added)—then balancing an intangible like experience against undetectable or unmeasurable deterioration would be some trick. The same problem, of course, must have faced the FAA on remand in trying to weigh the benefits of experience against its asserted concern about the allegedly unpredictable risks of "sudden incapacitation."

The more serious difficulty, however, with the FAA's continuing reliance on "sudden incapacitation"—the specter of a pilot in the cockpit, of no matter what age, suddenly stricken by a heart attack or a stroke—hasn't much to do with whether the incapacitated pilot, suddenly stricken, could by dint of experience avert a crash. At that point, the safety net obviously is not experience but the presence of one or two other qualified pilots in the cockpit. Instead, the troubling problem with the FAA's "sudden incapacitation" justification is its premise. The panel in *Aman* found substantial evidence to support the FAA's conclusion that current medical science cannot determine which pilots over 60 will be most vulnerable to sudden and incapacitating disability. But that should have been a follow-up inquiry, not the first one. The first inquiry should be whether there is substantial evidence, current and valid in 1990, to support the proposition that all pilots, age 60 and older, are significantly more prone to sudden medical catastrophe than other pilots. For the age 60 and out rule makes sense only if it screens for risks that are significantly higher for all 60–year–olds than for 30, 40 or 50–year–olds.

Otherwise, the rule is simply an arbitrary, overly broad and outmoded presumption, smelling of age discrimination, about infirmities which do not uniformly afflict all pilots over 60 and should not be assumed to.

The panel in *Aman* also remanded with instructions to the FAA to "make sense" of its increasing willingness to issue "special certificates" to younger pilots with records of heart disease, drug abuse and alcoholism—which conditions, like aging, can be progressive—in the face of its stubborn refusal ever to grant exemptions from the age 60 rule. In response, the FAA has now explained that "present tests can predict the expected course of a known medical deficiency" such as heart disease or alcoholism "with sufficient accuracy to allow valid, individualized judgments" but that "the same accuracy is not possible when assessing the decrements associated with the aging process." FAA Brief at 32. The FAA, however, has not offered any evidence to support this distinction between the special certificates it grants to younger pilots and its refusal even to promulgate meaningful regulations and criteria for age exemptions for older pilots, much less to grant an age exemption to an older pilot. And there is no citation, either in the FAA's brief or its latest order, for the proposition that the symptoms of alcoholism, drug abuse and heart disease can be monitored more closely and reliably than the "decrements" of aging. We defer to agency expertise, where expertise has been demonstrated, but "deference should not be equated with a license to issue inconsistent determinations." *Aman*, 856 F.2d 957. The pilots have plausibly alleged that the FAA's distinctions and exemption practices are inconsistent. The FAA has only answered with unsupported and unconvincing assertions.

The majority acknowledges that "exactly how [the FAA's asserted] distinction [between aging and other conditions] applies as a practical matter is not entirely clear to us," majority op. at 321, but concludes that for present purposes, it will not require more of the FAA with respect to the con-

sistency of restoring stricken younger (59 and under) pilots (suffering from alcohol abuse, drug abuse, heart conditions) to duty while grounding other pilots, 60 and over, whose records and physical condition are, by contrast, impeccable.

## III

The FAA's record here is more than just "disappointing." *Aman,* 856 F.2d at 949. The agency has relied on a seriously flawed Flight Time study even though, as the majority points out, "various experts, even some from the FAA, state that the study should not be relied on as determinative—or even probative on the question of the continued validity of the age sixty rule." Majority op. at n. 1. In addition, as the majority also recognizes, "the FAA's own study on its face may in some aspects be construed to support the petitioners' claims...." *Id.* at 321. The FAA has also relied on evidence of automobile traffic accidents involving fatalities as related to age. But again, as the majority points out, "The connection between automobile drivers and pilots itself seems tenuous given the pilots' training, demonstrated proficiency, medical fitness, etc." and "attempts to relate nonparallel categories of automobile *fatalities* with aircraft *accidents*" does not reflect "exposure." *Id.* at 321.

The petitioners, as the majority also concedes, face a Catch–22, if the FAA and this court require them to prove, with statistics that reflect actual flight time in large passenger transport planes with more than thirty passengers, that they can fly those planes as safely as pilots who are not yet 60. For until at least one exemption has been granted, none of the petitioners are eligible to pilot such flights and consequently no such statistics can be compiled. It is possible that statistics might be available for petitioners' flight time in the same large passenger aircraft but carrying thirty passengers or less or cargo. If such statistics are available, they have not been referred to by the FAA or the pilots.

In lieu of statistics, petitioners have presented impressive evidence of pilots on the brink of age 60 performing heroic deeds and saving lives where less experienced pilots might have failed. They have also presented what the majority concedes is "impressive expert opinion evidence" that at least some experienced pilots over age 60 are qualified to fly large commercial aircraft and may be even better qualified than younger, less experienced pilots. And, relying on figures from the National Transportation Safety Board, they have presented evidence that licensed pilots age 60 and older show a lower accident rate per 1,000 pilots than pilots in other age groups, although those statistics do not reflect the number of hours flown by members of each age group and we do not know, therefore, whether pilots age 60 and over fly more or fewer hours per year than pilots in other age groups.

The majority concludes, on the basis of the foregoing, that the FAA has presented "substantial evidence" in support of an absolute 60 and out rule, although it admits that it has seen "no compelling evidence that granting exemptions would increase the risk of accident...." Majority op. at 322. The majority also concludes that it has seen "no strong evidence that the experience of the 60–and–over pilot clearly overbears the danger of deterioration of piloting skills (or of sudden incapacitation) associated with the aging process." *Id.*

Since the FAA has refused as a matter of policy to grant any exemptions, what the FAA and the majority are holding, in effect, is that *every* airline pilot, on his or her 60th birthday, and regardless of physical condition or experience, becomes a significantly greater safety hazard than before, even though, just one day before, he or she was FAA certified, qualified and safe. The evidence in this case does not warrant that conclusion. Nor does everyday, ordinary good old common sense.

## IV

Rather than again urging the FAA to recognize the need for keeping up with advanced technologies and accommodating other points of view, I would vacate the FAA's latest order and remand for action on three fronts.

I would remand, first, for consideration of the adoption of regulations establishing ascertainable and meaningful standards to govern the granting of at least some exemptions to the age 60 rule. The FAA's present regulations—which dangle the possibility of an exemption to a pilot who can show "why the exemption would not adversely affect safety" or why, at least, it "would provide a level of safety equal to that provided by the rule," 14 C.F.R. § 11.25(5)—do not sufficiently guide the agency in exercising its discretion and do not begin to provide adequate notice to pilots about the kind of showing that would justify an exemption. Cf. *Allison v. Block*, 723 F.2d 631, 636–38 (8th Cir.1983) (requiring the development of substantive standards to guide discretion); *Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 596–98 (D.C.Cir.1971); *Holmes v. NYCHA*, 398 F.2d 262, 264–65 (2d Cir. 1968); 2 K. Davis, Administrative Law Treatise § 7.26 at 128–32 (2d ed. 1979). See also *Morton v. Ruiz*, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). Moreover, in light of the agency's policy of never granting age 60 exemptions, its present regulations are a fraud.

I would also remand for a showing, by current and substantial evidence, that all pilots age 60 and over are significantly more prone to "sudden incapacitation" than all pilots under 60. The agency should re-examine the relevant data and articulate a satisfactory explanation, rationally connected to the facts, for its ongoing reliance on "sudden incapacitation" and for drawing a line at age 60.

Finally, I would remand, yet again, for a reasoned and full explanation for treating requests for special medical certificates under 14 C.F.R. § 67.19 differently than petitions for exemptions from the age 60 and out rule. Cf. *Airmark Corp. v. FAA*, 758 F.2d 685, 691–95 (D.C.Cir.1985) (recognizing the caprice with which the FAA rules on exemptions in other areas). And in that connection, I would require the FAA to consider the possibility that obligating pilots 60 and older to undergo more frequent medical and skills examinations than other pilots—a technique the agency already

uses to monitor the condition of pilots who have been granted "special issuances" under 14 C.F.R. § 67.19—might provide enough accurate and up-to-the-minute information about a pilot's health and skills to enable the agency to make *individualized* determinations about the risks of letting any particular captain, 60 or older, pilot a Part 121 flight, rather than arbitrarily and capriciously denying exemptions to all.