**LOUISIANA SEAFOOD MANAGEMENT, et al.**

v.

**FOSTER, et al.**

No. Civ.A. 96–106.

United States District Court, E.D. Louisiana.

June 24, 1999.

Paul R. Baier, Baton Rouge, LA, Robert A. Barnett, Guste, Barnett & Shushan, LLP, New Orleans, LA, for John E. Thompson, Eddie LeJuine, Matthew Reagan, Clara Gerica, Todd Stipelcovich, Barry Schaferkotter, David A. Mills, Christon Cheramie, Peter Steven Hotoph, Eugene Hickman, Chad Lay, Lindberg Santini, Ned F. Malley, Jr., Barisich Inc.

Judith Ruth Atkinson, Thomas E. Balhoff, Roedel, Parsons, Koch, Frost, Balhoff & McCollister, Baton Rouge, LA, for Coastal Conservation.

Edmond W. Shows, Shows, Cohn & Cali, Baton Rouge, LA, Frederick Coller Whitrock, Louisiana Dept. of Justice, Public Protection Div., Baton Rouge, LA, Thomas Michael Landrum, Donald E. Puckett, Laura Heap, Louisiana Dept. of Wildlife and Fisheries, Baton Rouge, LA, Ronnie J. Berthelot, Shows, Cali & Burns, Baton Rouge, LA, for Murphy J. Foster, Jr., Richard P. Ieyoub, Joe L. Herring, Peter Vujnovich, John F. Schneider, Perry Gisclair, Daniel Babin, Joseph P. Cormier, Glynn Carver, Wynton Vidrine, Louisiana Wildlife and Fisheries Commission, Louisiana Dept. of Wildlife and Fisheries.

Edmond W. Shows, Shows, Cohn & Cali, Baton Rouge, LA, Frederick Coller Whitrock, Louisiana Dept. of Justice, Public Protection Div., Baton Rouge, LA, Thomas Michael Landrum, Donald E. Puckett, Laura Heap, Louisiana Dept. of Wildlife

and Fisheries, Baton Rouge, LA, Ronnie J. Berthelot, Shows, Cali & Burns, Baton Rouge, LA, for Charles Clark.

PORTEOUS, District Judge.

This matter came for hearing upon the plaintiffs' motion for a new trial, seeking this Court to reexamine its previous dismissal of the plaintiffs' federal suit. Oral arguments were waived and this matter was taken under submission on the briefs only. The Court, having reviewed the record, the applicable law, and the memoranda of the parties, is fully advised in the premises and ready to rule.

*ORDER AND REASONS*

## I. FACTUAL BACKGROUND

The facts of this case have been discussed previously at length. The Court hereby adopts the facts as set forth previously, and refers the parties to the voluminous record of this case for any required recitation of the facts. Briefly, the plaintiffs now come before the Court seeking a new trial on the grounds of legal error. The plaintiffs contend that concerns over due process, the absence of privity between the state and federal plaintiffs challenging the "Gill-net" law, and the alleged failure of the Louisiana state court in complying with the requirements of Louisiana class action law prohibit this Court from barring this suit through the doctrine of res judicata. The defendants submit that this Court was correct in barring this suit in its earlier Order and Reasons. *See* Doc. # 71—*Louisiana Seafood Management Council, Inc. v. Foster*, 46 F.Supp.2d 533 (E.D.La.1999) (hereinafter, "Initial Dismissal").

## II. LEGAL ANALYSIS

### A. Motion for a New Trial

Federal Rule of Civil Procedure ("FRCP") 59(a) states that a district court may grant a new trial "on all or part of the issues . . . for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." The decision to grant or deny a motion for a new trial is within the sound discretion of the trial court. *Pryor v. Trane Company*, 138 F.3d 1024, 1026 (5th Cir.1998). Although FRCP 59(a) does not enumerate grounds for a new trial, a district court may grant a new trial if it committed prejudicial error or if the verdict is against the great weight of the evidence. *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir.1985).

### B. *Richards v. Jefferson County, Alabama*

The plaintiffs in the "Gill-net" matter contend that the application of the doctrine of res judicata in this case is violative of due process requirements as delineated in *Richards v. Jefferson County, Alabama*, 517 U.S. 793, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996) (hereinafter, "*Richards*, 517 U.S. 793, 116 S.Ct. 1761, 135 L.Ed.2d 76"). This Court will first analyze *Richards*, then examine its progeny and the manner in which those cases viewed "virtual representation" as a category for finding privity between different sets of plaintiffs for the purposes of res judicata.

In an earlier action, the acting director of finance for the city of Birmingham and the city itself brought suit challenging the validity of the county's occupational tax on state constitutional grounds. This prior action had been consolidated for trial with a separate suit brought by three county taxpayers. *See Bedingfield v. Jefferson County*, 527 So.2d 1270 (hereinafter, "the *Bedingfield* suit"). The end result was an upholding of the tax by the Supreme Court of Alabama. *Id.* The petitioners in the subsequent *Richards* suit were two individuals privately employed by the county. 517 U.S. at 794, 116 S.Ct. 1761. These individuals represented a class of all non-federal employees subject to the county's tax. *Id.* at 795, 116 S.Ct. 1761. The petitioners in *Richards* challenged the county's tax on both federal and state constitutional grounds. *Id.*

The state trial court in the *Richards* suit determined that the state constitutional claims were barred by the results of the prior litigation, but concluded that the federal claims were not barred because they had not been decided by either the *Bedingfield* trial court or the Alabama Supreme Court. *Id.* However, on appeal the Alabama Supreme Court, recognizing that a prior judgment is generally " 'res judicata not only as to all matters litigated and decided by it, but as to all relevant issues which could have been but were not raised and litigated in the suit,' " ordered that the federal claims were barred as well as the state claims as a result of the adjudication in the *Bedingfield* suit. *Id.* at 795–796, 116 S.Ct. 1761. Among other reasons, the Alabama Supreme Court felt that res judicata was properly applied to both the federal and state claims here because the *Richards* petitioners were adequately represented by the petitioners in the *Bedingfield* suit. *Id.* at 796, 116 S.Ct. 1761.

The United States Supreme Court granted certiorari in *Richards* and determined that the decision of the Alabama Supreme Court deprived the petitioners of the due process of the law guaranteed by the Fourteenth Amendment. *Id.* at 797, 116 S.Ct. 1761. After setting forth the general rules for the application of the doctrine of res judicata, the United States Supreme Court stated as follows:

> The limits on a state court's power to develop estoppel rules reflect the general consensus " 'in Anglo–American jurisprudence that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.' *Hansberry v.*

*Lee,* 311 U.S. 32, 40, 61 S.Ct. 115[117], 85 L.Ed. 22 (1940).... This rule is part of our 'deep-rooted historic tradition that everyone should have his own day in court.' 18 C[harles]. [A.] Wright, A[rthur]. [R.] Miller, & E[dward]. [H.] Cooper, Federal Practice and Procedure § 4449, p. 417 (1981)." *Martin v. Wilks,* 490 U.S. 755, 761–762, 109 S.Ct. 2180, 2184, 104 L.Ed.2d 835 (1989). As a consequence, "[a] judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings." *Id.,* at 762, 109 S.Ct., at 2184; *Blonder–Tongue Laboratories, Inc. v. University of Ill. Foundation,* 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971).

*Id.* at 797–798, 116 S.Ct. 1761. Despite these general requirements, the United States Supreme Court pointed out that "these principles do not always require one to have been a party to a judgment in order to be bound by it. Most notably, there is an exception when it can be said that there is 'privity' between a party to the second case and a party bound by an earlier judgment." *Id.* at 798, 116 S.Ct. 1761. Moreover, the Supreme Court explained, "although there are clearly constitutional limits on the 'privity' exception, the term 'privity' is now used to describe various relationships between litigants that would not have come within the traditional definition of that term. *See generally* Restatement (Second) of Judgments, ch. 4 (1980) (Parties and Other Persons Affected by Judgments)." [1] *Id.*

Furthermore, noting that the parties to the *Bedingfield* suit failed to provide peti-

---

**1.** In addition, the Supreme Court quoted its opinion in *Martin v. Wilks,* 490 U.S., at 762, n. 2, 109 S.Ct., at 2184, n. 2, wherein the Court maintained as follows:

> We have recognized an exception to the general rule when, in certain limited circumstances, a person, although not a party, has his interests adequately represented by someone with the same interests who is a party. *See Hansberry v. Lee,* 311 U.S. 32,

41–42, 61 S.Ct. 115, 117–118, 85 L.Ed. 22 (1940) ('class' or 'representative' suits); Fed. Rule Civ. Proc. 23 (same); *Montana v. United States,* 440 U.S. 147, 154–155, 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979) (control of litigation on behalf of one of the parties in the litigation).

*Richards,* 517 U.S. at 798–799, 116 S.Ct. 1761.

tioners with any notice that a suit was pending which would conclusively resolve their legal rights, the Supreme Court reviewed its decision in *Hansberry v. Lee*, 311 U.S., at 40–41, 61 S.Ct., at 117–118, for guidance on the interplay of due process and the doctrine of res judicata. *Id.* at 800–801, 116 S.Ct. 1761. In *Hansberry*, the Supreme Court "recognized the 'familiar doctrine . . . that members of a class not present as parties to the litigation may be bound by the judgment where they are in fact adequately represented by parties who are present, or . . . the relationship between the parties present and those who are absent is such as legally to entitle the former to stand in judgment for the latter.' *Hansberry*, 311 U.S., at 42–43, 61 S.Ct., at 118–119." *Richards*, 517 U.S. at 800–801, 116 S.Ct. 1761. However, the doctrine of representation of absent parties in a class suit could not be applied to the petitioners in *Hansberry* (the second action) because of the particular facts of that case. *Id.* This conclusion resulted from the *interests* of the class members who had been a party to the prior litigation being *in conflict* with the absent members who were the defendants in the subsequent action. *Id.* at 801, 116 S.Ct. 1761.

Moreover, the Supreme Court reasoned that "[e]ven assuming that our opinion in *Hansberry* may be read to leave open the possibility that in some class suits adequate representation might cure a lack of notice," [2] *Hansberry* could not be read to

permit the application of res judicata in the *Richards* suit. *Id.* at 801, 116 S.Ct. 1761. The Supreme Court explained that in order for a prior proceeding to have a binding effect on absent parties, the prior proceeding "would at least have to be 'so devised and applied as to insure that those present are of the same class as those absent and that the litigation is so conducted as to insure the full and fair consideration of the common issue.' [*Hansberry,*] 311 U.S., at 43, 61 S.Ct., at 119; *cf. Phillips Petroleum Co. v. Shutts*, 472 U.S., at 811–812, 105 S.Ct., at 2974." *Id.* Finding that the *Bedingfield* suit did not conform to the above-stated description, the Supreme Court denied any preclusive application of the *Bedingfield* suit to *Richards*. *Id.* The Supreme Court emphasized that the doctrine of adequate representation could not be applied here because of the following reasons: (1) "the three county taxpayers who were parties in *Bedingfield* did not sue on behalf of a class;" (2) "their pleadings did not purport to assert any claim against or on behalf of any nonparties;" and, "the judgment they received did not purport to bind any county taxpayers who were non-parties." *Id.*[3] Therefore, since the Supreme Court concluded that the petitioners in *Bedingfield* and *Richards* were "best described as mere 'strangers' to one another," due process prevented the *Richards* petitioners from being bound by the *Bedingfield* judgment.[4] *Id.* at 802, 116 S.Ct. 1761.

2. *But cf., Id.,* at 40, 61 S.Ct., at 117; *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974); *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S., at 319, 70 S.Ct., at 659–660.

3. *See also South Central Bell Telephone Company v. Alabama,* —— U.S. ——, ——, 119 S.Ct. 1180, 1185, 143 L.Ed.2d 258 (1999) (where the Supreme Court reaffirmed *Richards* by stating that because of factors similar to those present in *Richards,* adequate representation could not exist between two sets of petitioners that were mere "strangers" to one another).

4. This Court notes in the following passage that the Supreme Court distinguished the doc-

trines of "res judicata" and "stare decisis" when responding to the assumption that the *Bedingfield* action conclusively established the constitutionality of the occupation tax:

Of course, we are aware that governmental and private entities have substantial interests in the prompt and determinative resolution of challenges to important legislation. . . . [However, a] state court's freedom to rely on prior precedent in rejecting a litigant's claims does not afford it similar freedom to bind a litigant to a prior judgment to which he was not a party. That general rule clearly applies when a taxpayer seeks a hearing to prevent the State from subjecting him to a levy in violation of the Federal Constitution.

## C. *Richards' Progeny*

Several cases have cited to *Richards* for support when dealing with preclusion through privity; however, there are three main Circuit Court of Appeals decisions which this Court believes most thoroughly address the issue of "virtual representation." *See Tice v. American Airlines,* 162 F.3d 966 (7th Cir.1998); *Bittinger v. Tecumseh Products Company,* 123 F.3d 877 (6th Cir.1997); and, *Tyus v. Schoemehl,* 93 F.3d 449 (8th Cir.1996). After reviewing these cases, this Court believes that an initial examination of *Tyus* is most helpful.

### (i) *Tyus v. Schoemehl*

This suit was the second one filed challenging the validity of the new St. Louis aldermanic boundaries. *Tyus,* 93 F.3d at 450. The petitioners in both suits challenged the boundaries pursuant to the Voting Rights Act and the federal constitution. *Id.* at 450–452. Petitioners were in essence claiming that the new boundaries impermissibly diluted the voting strength of African–Americans in this area by fragmenting black voters. *Id.*

Among the named plaintiffs in the first suit ("the Alderman–AAVR suit") were five African–American St. Louis alderman and the African American Voting Rights Legal Defense Fund ("AAVR"). *Id.* at 451. The defendants in the first suit (hereinafter, collectively referred to as "the City") filed a motion for summary judgment. *Id.* After having a dispute over trial strategy with their original counsel, the Alderman plaintiffs filed a motion to voluntarily withdraw from the suit and have their claims dismissed without prejudice. *Id.* However, before the motion to withdraw was disposed of by the court, the Alderman plaintiffs (through their new attorney) attempted to file a late opposition to the City's motion for summary judg-

ment. This motion for leave to file late was denied. *Id.*

While the City's motion for summary judgment was pending, but before any ruling on the Alderman plaintiffs' motion to withdraw, the Alderman plaintiffs filed a second lawsuit (hereinafter, "the Miller suit") against the City raising the same claims that were raised in the Alderman–AAVR suit. *Id.* Both suits were filed in federal district court. In the new suit the Alderman plaintiffs were joined by three additional individual plaintiffs. *Id.* at 452. At this time, the same counsel represented the petitioners in each suit. *Id.*

Eventually, the court in the first suit (*i.e.,* the Alderman–AAVR suit) granted the City's motion for summary judgment and denied as moot the Alderman plaintiffs' motion to withdraw. *Id.* After these rulings by the court, the plaintiffs in the first suit filed a FRCP 59(e) motion to alter or amend the court's previous orders. *Id.* The motion was denied. *Id.* Furthermore, the Miller suit had been stayed pending the resolution of the FRCP 59(e) motion. *Id.* After that motion was denied, the plaintiffs in the Miller suit moved to amend their complaint, dropping the Alderman plaintiffs from the suit, and adding two new plaintiffs. *Id.* However, the court in the Miller suit granted the City's motion for summary judgment on claim preclusion grounds,[5] then denied as moot the motions to amend the complaint and to add new plaintiffs. *Id.* The court held that the Alderman plaintiffs were clearly barred by the Alderman–AAVR suit from relitigating their claims in the Miller suit. *Id.* Regarding the three new individual plaintiffs in the Miller suit, the court held that although they were not parties to the first suit, they were "nevertheless in privity with the plaintiffs in the Alderman–AAVR suit under a theory of 'virtual representation.'" *Id.* The court viewed the three

---

*Richards,* 517 U.S. at 804–805, 116 S.Ct. 1761.

5. The Eight Circuit Court of Appeals affirmed the district court's summary judgment based upon issue preclusion instead of claim preclusion. *Id.* at 453, n. 5, 6.

new plaintiffs as having been adequately represented by the plaintiffs in the first suit. *Id.*

The Eighth Circuit Court of Appeals reviewed the decision of the district court solely as to whether the Miller plaintiffs were in privity with the Alderman plaintiffs, so that the Miller plaintiffs should be bound by the result in the Alderman–AAVR suit. *Id.* at 453. The Eight Circuit began by noting that "[p]reclusion is rooted in concerns of judicial economy" and in the protection of defendants from " 'the expense and vexation attending multiple lawsuits.' " *Id.* (citations omitted). Furthermore, the court set forth the general concerns over due process when dealing with preclusion as follows:

> [D]ue process concerns are present when the party sought to be precluded was not an actual party in the first lawsuit. Because preclusion based on privity is an exception to the "deep-rooted historic tradition that everyone should have his own day in court," *Richards v. Jefferson County, Ala.*, 517 U.S. 793, 798, 116 S.Ct. 1761, 1766, 135 L.Ed.2d 76 (1996) (citation omitted), courts must ensure that the relationship between the party to the original suit and the party sought to be precluded in the later suit is sufficiently close to justify preclusion. Thus, "the due process clauses prevent preclusion when the relationship between the party and nonparty becomes too attenuated." *Southwest Airlines Co. v. Texas Int'l Airlines,* 546 F.2d 84, 95 (5th Cir.), *cert. denied,* 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977).

*Id.* at 454. Furthermore, citing a Fifth Circuit case (*Aerojet–General Corp. v. Askew,* 511 F.2d 710 (5th Cir.)), the court in *Tyus* went on to consider the "adequate representation" or "virtual representation"

category of nonparties in privity with plaintiffs in a prior action,[6] and whether or not, based upon the facts of this case, due process was satisfied when the district court precluded the three new plaintiffs from maintaining the Miller suit. *Id.*

Moreover, while the principle of "virtual representation" is generally accepted, the court in *Tyus* noted that courts are divided on how to implement it. *Id.* at 454. Distinguishing between the wide and limited uses of the "virtual representation" doctrine, the court adopted the wide use, which involves a fact-intensive inquiry into "whether there exists a substantial relationship between the party and nonparty, such that the party adequately represented the interests of the nonparty." *Id.* at 454–455. Furthermore, the court stated,

> Because of the fact-intensive nature of these inquiries, there is no clear test that can be employed to determine if virtual representation is appropriate. It is evident, however, that because virtual representation rests on the notion that it is fair to deprive a nonparty of his day in court, "virtual representation has a pronounced equitable dimension." *Gonzalez v. Banco Cent. Corp.,* 27 F.3d 751, 761 (1st Cir.1994). A nonparty will be barred from bringing his claim only when "the balance of the relevant equities tips in favor of preclusion." *Id.*

*Id.* at 454. Noting the due process concerns of courts applying the more limited use of "virtual representation," the court in *Tyus* cited to *Richards,* and pointed out the "privity" exception that this Court has explained above. *Id.* at 455. The *Tyus* court reasoned that virtual representation falls squarely within *Richards'* "privity" exception. *Id.* In order to determine when there is a special relationship between the parties, so that they are no longer "mere

---

6. The Eighth Circuit here views "adequate representation" or "virtual representation" as synonymous with one another. Furthermore, the court recognizes these terms as merely a category for finding privity between nonparties and parties to the prior action. *Id.* at

454. We distinguish this view from the one taken by *Bittinger v. Tecumseh Products Company,* 123 F.3d 877, which views "virtual representation" as separate and distinct from "privity."

strangers," the court examined several guiding principles for determining when the "virtual representation" doctrine, which the court viewed as based upon the alignment of interests between the parties, appropriately bars relitigation of the nonparty's claims. *Id.* at 455–456. These principles are as follows:

> First, identity of interests between the two parties is necessary, though not alone sufficient. *See Mann v. City of Albany, Ga.,* 883 F.2d 999, 1003 (11th Cir.1989). Other factors to be considered "include a close relationship between the prior and present parties; participation in the prior litigation; apparent acquiescence; and whether the present party deliberately maneuvered to avoid the effects of the first action." *Petit v. City of Chicago,* 766 F.Supp. 607, 612 (N.D.Ill.1991) (citing 18 [Charles A.] Wright, [Arthur R.] Miller & [Edward H.] Cooper, Federal Practice & Procedure: Jurisdiction § 4457).

> Another factor to consider is adequacy of representation, *Gonzalez,* 27 F.3d at 762, which is best viewed in terms of incentive to litigate. [footnote omitted]. That is, one party "adequately represents" the interests of another when the interests of the two parties are very closely aligned and the first party had a strong incentive to protect the interests of the second party.

> Finally, the nature of the issue raised—whether a public law issue or private law issue—is important. Although virtual representation may be used in the private law context, its use is particularly appropriate for public law issues.

*Id.*

In the Eighth Circuits's application of the facts of its case to the guiding principles listed above, some basic findings were made. First, the court found that the claims of each set of petitioners were virtually identical; and, furthermore, there was even an overlap in plaintiffs between the two suits. *Id.* at 457. Secondly, the court was swayed in its finding of privity because the same counsel was utilized in both suits. *Id.* Moreover, the court identified a special alignment of interests in that most of the plaintiffs were aldermen and all the plaintiffs shared the same concern—the dilution of the African–American vote in St. Louis. *Id.*

Particularly, however, the court stressed two specific elements, the presence of which caused the court great concern about allowing the suit to go forward. These two elements were (1) the public law nature of the issue raised,[7] and (2) the tactical maneuvering that was so obviously taking place. *Id.* at 456–457. When viewed together these elements display how plaintiffs who are likewise affected by a piece of legislation can combine their efforts in order to "allow various members of a coordinated group to bring separate lawsuits in the hope that one member [or group of members] would eventually be successful, benefiting the entire group. This entails a significant cost to the judicial system and 'discourage[s] the principles and policies the doctrine of res judicata was designed to promote.' " *Id.* at 457. Allowing a coordinated group to continually raise public law issues already decided would risk allowing the litigation to "assume immortality." *Id.* at 456–457. In the context of a public law issue, if the plaintiffs in the first suit win, then everyone in the group benefits. *Id.* However, in the absence of "virtual representation" or preclusion through privity, plaintiffs in the group who tactically maneuvered away from the binding effects of the first suit,

---

7. This Court notes that the "Gill-net" ban law is a piece of state legislation that has an affect upon the private rights of the commercial fisherman to pursue their trade. This Court is not suggesting that the "Gill-net" ban law has merely an indirect impact upon the general public, such as the general dilution of African–American voting power. However, this Court is suggesting that the "Gill-net" ban law was created by a public body to apply across the board to individuals who wish to use gill nets to catch certain species of fish.

would nonetheless benefit from the first suit if it succeeds, but would not be penalized if the first suit fails.[8] *Id.* Such a situation would encourage "fence-sitting," thereby discouraging the principles behind the doctrine of res judicata. *Id.*

Based upon the court's findings that the guiding principles set forth above weighed heavily in favor of finding preclusion through privity, the claims of the Miller petitioners were adjudged to be barred by the doctrine of res judicata. This Court believes it would be helpful to review the concurring opinion in *Tyus* as well, in order to help distinguish the facts of the "Gill-net" case from such cases as *Tice v. American Airlines,* 162 F.3d 966, and *Bittinger v. Tecumseh Products Company,* 123 F.3d 877. Judge Henley concurred in the *Tyus* decision, expressing his agreement with the outcome of the majority along with his concerns over some of the language of the opinion. *Id.* at 458–459. Judge Henley specifically referred to the language of *Richards* regarding "notice" and the insurance that the prior proceeding involved "the full and fair consideration of the common issue." *Id.* at 459. Despite his misgivings about the wide use of the "virtual representation" doctrine utilized by the Eighth Circuit majority, Judge Henley stated as follows:

> I believe that on the facts here, the requirements of "notice" and "sufficient representation" were satisfied. In particular, the plaintiffs in the second suit clearly were on notice of the first litigation, because some of them had also been plaintiffs in the prior suit. Moreover, the same counsel represented plaintiffs in both actions. I believe that this identity of counsel and (at least some of the) plaintiffs also suggests that the "sufficient representation" require-

ment of due process was met. In addition, as the panel opinion points out, it appears that the principal reason for filing the second suit was to evade the judgment in the first suit.

*Id.*

This Court views *Tyus,* in both the majority and concurring opinions, as positive support for the preclusion of the federal "Gill-net" suit. The majority in *Tyus* adopts the widest possible use of "virtual representation" for finding preclusion through privity, and such a position may or may not be appropriate. However, considering the tempering language employed by the concurrence, the result in *Tyus* certainly can be paralleled to the result that this Court has reached in the "Gill-net" suit. The *Tyus* factors clearly sustain the conclusion reached by this Court in its Initial Decision. However, the Court will now examine two more cases that have thoroughly addressed "virtual representation," each of which held that res judicata should not have been employed to bar the second suit.

### (ii) *Bittinger v. Tecumseh Products Company*

In this second suit challenging the defendant's termination and restructuring of the insurance benefits of a group of retired hourly workers of the defendant, Tecumseh Products Company (hereinafter, "Tecumseh"), an individual (Charles Bittinger) sought relief through a proposed class action under ERISA and the Labor–Management Relations Act. *Bittinger,* 123 F.3d at 879.

Originally, when the defendant company altered the insurance benefits provided to this group of retired hourly workers, the retirees organized a response by meeting

---

**8.** Also, this Court fails to see how, in our "Gill-net" case, the state court plaintiffs, who have already had their claims adjudicated, would not benefit from an advantageous ruling in this federal court. The "Gill-net" ban must necessarily apply to all the commercial fisherman. This Court is not suggesting that

the "Gill-net" ban has been declared constitutional for all time, but only that petitioners in the federal suit who are in privity with the petitioners in the state court suit should be precluded from maintaining this cause of action under the doctrine of res judicata.

and subsequently forming a non-profit corporation aimed at the " 'unification of approximately 1200 hourly retirees from [the company] to seek legal advice for the reinstatement of promised benefits.' " (hereinafter, the abbreviation "UTPHR" will be used to refer to the organization, "Unified Tecumseh Products Hourly Retirees"). *Id.* Eventually, three of the organization's individual members brought a lawsuit (styled as a class action) against Tecumseh. *Id.* The organization (UTPHR) basically coordinated the first lawsuit—creating mailing lists, holding meetings, dealing with attorneys, and collecting money from its members (including Bittinger, the named plaintiff in the second suit, who contributed $20 several times) to support the activities of the organization, including the litigation of the first suit. *Id.* However, early on in the first suit, the court granted Tecumseh's motion for summary judgment and dismissed the action without a trial. *Id.* Because the case was dismissed before the class action issue was reached, the proposed class of retirees was never certified. *Id.*

Subsequently, Charles Bittinger brought this second suit as named plaintiff, seeking to have the same group of retirees (minus the three named individuals in the first suit) certified to have the same claims against Tecumseh relitigated. *Id.* The district court certified the class, then dismissed the suit, reasoning that the claims were barred under the doctrine of res judicata. *Id.* Although Bittinger, among other things, admitted that he would have been included in the class proposed by the first suit, actually contributed money to the maintenance of the first suit, and signed an affidavit in support of the first suit, the Sixth Circuit Court of Appeals, in a majority opinion, reversed the district court's application of res judicata and reinstated the second suit. *Bittinger,* 123 F.3d 877.

Citing to *Richards* the Sixth Circuit applied a narrow reading of that Supreme Court decision to support its reversal of the district court's decision and its rejection of "virtual representation" in this context. *Id.* at 880–882. Although the Sixth Circuit recognized *Richards'* approval of the "adequate representation" category for finding privity, the Sixth Circuit distinguished "adequate representation" from the broad notion of "virtual representation," such as that utilized in the majority opinion in *Tyus. Id.* While this Court is unable to distinguish in what manner the Sixth Circuit views the terms "adequate representation" and "virtual representation" as different, our interpretation of *Bittinger* is that it did not seem to recognize that which the other courts refer to as "virtual representation" or "adequate representation" as a category for finding privity.[9] Nonetheless, the Sixth Circuit expressed a strong preference for strict traditional rules in this area of res judicata, rather than the more fact-intensive inquiry into the equities of the case, as adopted by the court in *Tyus. Id.* at 881–882. Moreover, the Sixth Circuit signaled its concern about the requirements of

9. However, the Sixth Circuit seems to point to § 41 of the Restatement (Second) as the guideline for the categories of situations where privity between parties may be found. *Id.* at 880. Although the Sixth Circuit mentions *Richards'* approval of "adequate representation," the remaining portions of the opinion discuss "virtual representation" and the Sixth Circuit's disapproval of its use to extend the application of res judicata. The decision in *Bittinger,* which is attempting to determine "whether under the doctrine of 'virtual representation' res judicata should be expanded to cover plaintiffs who were not parties or in 'privity' with a party in a previous action," must be distinguished from *Tyus,* which treats "virtual representation" (*i.e.,* "adequate representation") as simply a category for finding privity. *Id.* at 879. Also, the dissent in *Bittinger* states as follows: "the majority erroneously concludes that § 41 [of the Restatement (Second) of Judgments] establishes a minimum threshold for finding privity. However, ... the Supreme Court has indicated that § 41 is but one example of privity, and that, in addition, adequate representation will also suffice." *Id.* at 888 (citing *Richards,* 517 U.S. 793, 116 S.Ct. 1761, 135 L.Ed.2d 76).

FRCP 23 in such instances, whereby a broad application of a separate "virtual representation" doctrine may create an end-run around the limitations of FRCP 23. *Id.* at 882.

However, as in *Tyus,* there is a dissent to the majority opinion in *Bittinger.* Judge Ryan refers to the strong alignment of interests between the named plaintiffs in the two suits and their reliance on the organization (UTPHR) created for the sole purpose of helping to resolve through litigation the complaints of these former hourly workers of Tecumseh. *Id.* at 885–890. Moreover, like the court in *Tyus,* the dissent here uses the terms "virtual representation" and "adequate representation" interchangeably. *Id.* In his support of a finding of privity through virtual representation,[10] Judge Ryan points to several factors which promote the application of res judicata through privity: the strong alignment of interests of the former hourly workers, including their creation of and control over UTPHR; the fact that UTPHR authorized the filing of, financed and controlled both suits (including the hiring of attorneys); the fact that the claims in the two suits were virtually identical; and, the fact that Bittinger himself, the lead plaintiff in the second suit, contributed money to UTPHR and even participated in the first suit (most expressly, through the signing of a supportive affidavit). *Id.*

Based on these facts, the dissent asserts that "UTPHR is precluded from relitigating claims it has already lost; it should not be able to escape the effects of res judicata merely by naming a different plaintiff." [11]

---

10. This view is distinguished from that of the majority, which seemed to view virtual representation as something other than a category for finding privity.

11. Like *Tyus,* the dissent here distinguishes the facts of *Richards* in that the plaintiffs in the second suit in *Richards* had no notice of the first suit and in that the party to the first suit and the nonparty allegedly bound in the subsequent suit were "mere 'strangers.'" *Id.* at 888.

*Id.* at 887. The dissent points to a leading commentator on this subject, which has stated, " 'It seems clear enough that an association should not be able to evade preclusion continually by averring that unidentified members are not bound and bringing successive suits by claiming injury to different identified members.' 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4456." [12] *Id.*

It must be noted that the dissent points to two instances, at least one of which must be satisfied in order for adequate representation to apply. These two instances are (1) legal accountability and (2) acquiescence to representation. *Id.* at 887. The second instance, being more pertinent to the "Gill-net" matter, was explained as follows by the dissent:

> The final strain of virtual representation is that of acquiescence. "A person having a claim or defense paralleling or related to other litigation may agree that the outcome of the other litigation will be determinative of the issues in his case.... An agreement to be bound by the result of another action ... may be implied from conduct and manifestations of intention." Restatement (Second) of Judgments § 40 cmt. a.

*Id.* at 888–889. Giving an example of acquiescence, the dissent cited to *Cauefield v. Fidelity and Casualty Co. of New York,* 378 F.2d 876 (5th Cir.1967), a case where

> nonparties had acquiesced to a judgment in light of the fact that their federal case had been continued in order for a state case, the result of which ultimately

---

12. However, the dissent does limit this language in its discussion of FRCP 23, when it suggests that someone participating in such a litigation group could simply file separately to preserve his claims. *Id.* at 889. This Court has concern over that point when tactically maneuvered plaintiff(s) in a stayed second suit are awaiting the outcome of the first suit, the positive outcome of which will directly benefit those plaintiffs.

bound them, to be resolved. As the Fifth Circuit later pointed out in discussing *Cauefield*, the preclusive effect of the state court proceeding on the federal litigants arose out of a "tacit agreement" to "resolve all the numerous identical claims" in state court. *Benson and Ford*, 833 F.2d at 1176.

*Id.* at 889. This Court has previously cited to *Cauefield* as support for the application of res judicata to the "Gill-net" matter. *See* "Initial Decision." The dissent, having found both legal accountability and acquiescence, along with the other factors mentioned above, believed that res judicata should have barred the second suit in this case.

This Court views *Bittinger* as very limited in its recognition of "virtual representation" as a category for finding privity. It appears that the majority does not view "virtual representation" as such a category at all. This Court does not believe that *Richards* suggests such a strict result. However, the dissent in *Bittinger* is more faithful to the ·current trend of treating "virtual representation" as a category of finding preclusion through privity. A decision this Court believes to be more in line with· *Richards* and a narrow view of *Tyus* is *Tice v. American Airlines*, 162 F.3d 966 (7th Cir.1998).

### (iii) *Tice v. American Airlines*

This case involved a later suit by American Airline pilots challenging American's practice of forcing pilots to retire when they turned 60 years of age. *Tice*, 162

F.3d at 968–970. There had been previous suits challenging American's policies towards the "flight officer" position.[13] *Id.* One of those previous suits was brought by a group of individuals who had not been hired by American due to American's "up-or-out" policy. *Id.* The other was brought by a group of older pilot and co-pilots who were significantly affected by American's "up-or-out" policy. *Id.* However, the group in the *Tice* suit is distinguishable from both of the previous groups. One of the first groups was comprised of individuals who had not been hired by American because of their age (not current employees being forced to retire). *Id.* The other group, while being very similar to the *Tice* group, cannot be seen as having been adequately aligned with the *Tice* group because their interests diverged at the time of the previous suit (the plaintiffs in the *Tice* suit were not even eligible to join the previous litigation because they were too young at the time; furthermore, their interests at the time of the previous suits actually diverged from those of the first employee plaintiffs, because the forcing out of older employees can be seen as directly benefiting younger employees). *Id.* The Seventh Circuit rejected the application of res judicata here because there was not an adequate alignment of interests between the different groups sufficient to justify a finding of privity through "virtual representation" (or "adequate representation").

While the Seventh Circuit did not find preclusion through privity in this case, the court did view "virtual representation" as a

---

**13.** The "flight officer" position is the third position on an airplane, which American used as a training position for future pilots and co-pilots. The problem here arose because the Federal Aviation Administration (FAA) instituted a rule that no person may serve as a pilot if that person has reached the age of 60. Therefore, American would only hire and retain younger people in the "flight officer" position, so that once those individuals had trained for a time in the "flight officer" position, they could advance to pilots or co-pilots (referred to as American's "up-or-out" policy). Different groups were upset with this policy, namely older individuals seeking employment with American, who were not young enough in American's eyes to be able to sufficiently train as "flight officers," and then still be young enough to have a career as a pilot or co-pilot. Another group that opposed American's policy were current pilots or co-pilots for American, that were going to be forced to retire at the age of 60, because the only position available to them would be that of "flight officer." However, as stated earlier, that position was reserved for younger individuals as a training tool for advancement.

tool for determining the presence of privity. *Id.* at 971. The court stated that privity through virtual representation could be found by determining whether there was a sufficiently close identity of interests between the parties such that the application of res judicata would be appropriate. *Id.* Moreover, the Seventh Circuit recognized the factors utilized by the court in *Tyus,* and stated that a court applying these factors is attempting in reality "to determine the answer to the real (fact-specific) question—whether there was (or should be implied at law) the kind of link between the earlier and later plaintiffs that justifies binding the second group to the result reached against the first." *Id.* The court identified this question as identical to "the crux of the privity inquiry." *Id.* Applying the "virtual representation" inquiry to the facts of this case, the court held that the alignment of interests of the group in *Tice* were insufficient for privity to be found in this case. Also, the court made a special point of noting that there was no evidence of "manipulative litigation practices" here, a factor that the *Tyus* court considered heavily when barring the second suit in that litigation. *Id.* at 973.

Once again, the concerns over the interplay of "virtual representation" with the requirements of FRCP 23 were raised in *Tice. Id.* at 972–973. The court noted that compliance with the formal requirements of FRCP 23 is enough in itself to comply with due process and to justify binding later parties to earlier results. *Id.* at 972. However, the court states that without such formal compliance, "normal privity analysis must govern whether nonparties to an earlier action can be bound to the result." *Id.* 972–973. The court cited to familiar privity factors to be applied in that situation such as alignment of interests, the role the absentees played in the first suit (including awareness and participation), and the similarity of claims or defenses. *Id.* at 973.

Unlike *Bittinger, Tice* recognizes "virtual representation" as a category for finding preclusion through privity. The court here denied application of res judicata because the parties to the second suit were not sufficiently aligned in their interests to the parties bringing the previous suits. The court examined the appropriate factors and simply found that they were not present in this situation. Similar to *Tyus* and the dissent in *Bittinger, Tice* gives more appropriate consideration to using "virtual representation" as a tool for finding privity.

## D.  CONCLUSIONS

■ This Court, having examined the case law derived from *Richards,* including the concept of using "virtual representation" to find preclusion through privity, hereby reaffirms its Initial Decision barring the federal "Gill-net" suit under the doctrine of res judicata. As the Court has stated previously, the federal court plaintiffs were so aligned with the state court plaintiffs as to justify preclusion. All the petitioners involved here shared the same concern—the ability of the commercial fisherman to pursue their trade through the use of "gill-nets." The same lead plaintiff instituted both the state and federal suits. Moreover, the claims at issue here were identical in both suits. The federal court plaintiffs even proposed submitting the state court record as the sole basis for this Court to reach its decision. Furthermore, considering the overlap of plaintiffs between the two suits, the fact that the lead plaintiff in the two suits were the same, the use of the same counsel in both suits, and the participation of some of the federal plaintiffs in the state court suit, this Court finds it impossible to conclude that the federal plaintiffs were not on notice of the state court suit as one that could determine their legal rights. As in *Cauefield,* acquiescence to the preclusive effect of the state court suit can be implied from conduct and manifestations of intention. The federal plaintiffs certainly expected to benefit from a positive ruling in state court; therefore, they should not be

allowed to suffer no ill effects from a negative ruling.

Moreover, the tactical maneuvering employed by federal plaintiffs should not allow them to evade the state court ruling on the constitutionality of this Louisiana legislation. The coordinated efforts of the commercial fisherman and their representative associations in bringing two different suits in state and federal court, hoping to dodge res judicata by merely naming different plaintiffs with the same interests, cannot escape the concept of preclusion through privity.

The federal plaintiffs insist that they opted out of the state court suit by instituting their own action in federal court. But, essentially, these two actions were the same. The same lead plaintiff in the state court suit filed the federal court suit. ·The two sets of plaintiffs asked for the exact same class to be certified, while bringing the exact same claims. The overlap in plaintiffs, along with the evidence of tactical maneuvering (not to mention the federal plaintiffs' request to submit the state court record as their case in this Court), make it very difficult for this Court to see how the federal plaintiffs did not at least implicitly acquiesce to the state court determination here. Notwithstanding the language in *Williams v. State,* 350 So.2d 131, 138 (La.1977) (indicating that through the filing of a separate suit, plaintiffs included in the definition of the class "presumably" opted-out of the class action), this Court believes that the issue presented to it here is an issue of first impression under Louisiana law. Under class action rules, this Court cannot conceive how the federal plaintiffs were not on notice of the pendency of the state court suit as one that might determine their rights. Furthermore, there was clearly an opportunity for the federal court plaintiffs to participate in the state court suit, as evidenced by some of them doing so. Regarding the argument that the federal plaintiffs opted-out, this Court views the filing of the federal court suit as an impermissible way for these coordinated plaintiffs to take another bite at the apple, rather than opting out of the class action. Under such circumstances, this Court does not believe that the federal court plaintiffs validly avoided the state court ruling.

However, if the procedures of the state court with regard to the class action device are seen as faulty, then perhaps the best way to dispose of this issue is through a pure privity analysis (which this Court has already done). As suggested in *Tice,* without formal compliance with class action requirements, the normal privity analysis must govern. *Tice,* 162 F.3d at 972–973. As this Court has delineated, under a normal privity analysis, the federal plaintiffs are surely precluded.

Finally, this Court points to the reasoning employed in its Initial Decision and adopts it here to the extent that it is consistent with this opinion. That reasoning strengthens this Court's decision to bar the federal plaintiffs' claims through the doctrine of res judicata.

Accordingly,

**IT IS ORDERED** that the plaintiffs' motion for a new trial is hereby **DENIED.**